NR:RCH/EMR
F. #2017R01784

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – – – – – – –X

IN THE MATTER OF THE SEARCH OF:

(i)      ONE APPLE IPHONE, MODEL
         NUMBER MQAN2LL/A, IMEI
         NUMBER 359407088847136;
(ii)     ONE SAMSUNG GALAXY S7
         CELLULAR PHONE, IMEI NUMBER
         357754070342622;
(iii)    ONE APPLE IPHONE, SERIAL
         NUMBER F4GV8GUNJC6F;
(iv)     ONE SAMSUNG GALAXY S8
         CELLULAR PHONE, MODEL
         NUMBER A1784, IMEI NUMBER
         358332084023576;
(v)      ONE APPLE IPHONE 8, WHITE IN
         COLOR, SERIAL NUMBER
         353010096491305;
(vi)     ONE APPLE IPHONE, SILVER AND
         WHITE IN COLOR, MODEL
         NUMBER MQ7R2LL/A, SERIAL
         NUMBER F4GVR5KKJC6L;
(vii)    ONE APPLE IPHONE, ROSE GOLD
         IN COLOR, SERIAL NUMBER
         FD3VL9GGJCM1; AND
(viii)   ONE APPLE IPHONE 7 PLUS,
         MODEL NUMBER A1784, FCC ID
         NUMBER BCGE3092A, IC NUMBER
         579C-E3092A;

– – – – – – – – – – – – – – – – – – – – – – – –X

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR
SEARCH WARRANT

(18 U.S.C. §§ 666(a)(1)(A) and
1347(a); R. 41)

18-M-1009

EASTERN DISTRICT OF NEW YORK, SS:

                MAEGAN REES, being duly sworn, deposes and states that she is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— the electronic devices further described in Attachment A—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for over one year.   During my tenure with the FBI, I have participated in investigations involving, among other things, fraud and financial crimes.   I have also conducted interviews, made arrests, executed search warrants, and secured other relevant information using a variety of investigative techniques.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; my communication with other law enforcement officers; my review of reports of other law enforcement officers involved in the investigation; and my review of other records associated with the investigation.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.   The information contained in this affidavit includes information that I obtained from other law enforcement agents and officers, and from law enforcement and public records databases. The statements described in this affidavit are set forth in sum, substance, and in part.

## IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

4.      This affidavit is submitted in support of an application for warrants to search: (i) ONE APPLE IPHONE, MODEL NUMBER MQAN2LL/A, IMEI NUMBER 359407088847136 ("DEVICE #1"); (ii) ONE SAMSUNG GALAXY S7 CELLULAR

PHONE, IMEI NUMBER 357754070342622 ("DEVICE #2"); (iii) ONE APPLE IPHONE,

SERIAL NUMBER F4GV8GUNJC6F ("DEVICE #3"); (iv) ONE SAMSUNG GALAXY S8

CELLULAR PHONE, MODEL NUMBER A1784, IMEI NUMBER 358332084023576

("DEVICE #4"); (v) ONE APPLE IPHONE 8, WHITE IN COLOR, SERIAL NUMBER

353010096491305 ("DEVICE #5"); (vi) ONE APPLE IPHONE, SILVER AND WHITE IN

COLOR, MODEL NUMBER MQ7R2LL/A, SERIAL NUMBER F4GVR5KKJC6L

("DEVICE #6"); (vii) ONE APPLE IPHONE, ROSE GOLD IN COLOR, SERIAL

NUMBER FD3VL9GGJCM1 ("DEVICE #7"); and (viii) ONE APPLE IPHONE 7 PLUS,

MODEL NUMBER A1784, FCC ID NUMBER BCGE3092A, IC NUMBER 579C-E3092A

("DEVICE #8") (collectively, the " SUBJECT DEVICES"), which are currently within the

possession of the FBI within the Eastern District of New York, described in Attachment A,

for evidence, instrumentalities, contraband and/or fruits of violations of federal criminal law,

including Theft Concerning Programs Receiving Federal Funds, in violation of 18 U.S.C.

Section 666(a)(1)(A), and Health Care Fraud, in violation of 18 U.S.C. Section 1347 (the

"SUBJECT OFFENSES").

## PROBABLE CAUSE

5.       On October 2, 2018, the Honorable Vera M. Scanlon, United States Magistrate

Judge for the Eastern District of New York, signed a complaint and issued arrest warrants

authorizing the arrest of KADERRAH DOYLE ("DOYLE"), CARA STEINBERG

("STEINBERG"), MARINA GOLFO ("GOLFO"), EGO ONAGA ("ONAGA"), LYUBOV

BEYLINA ("BEYLINA"), DANIELLE SCOPINICH ("SCOPINICH"), PATRICIA HAKIM

("HAKIM") and ENOCH MENSAH ("MENSAH"), (collectively, "the defendants").   See

United States v. Doyle et al., 18 MJ 927 (the "Complaint"). The Complaint is attached

hereto as Exhibit A and incorporated herein by reference.

6.     As set forth in the Complaint, the FBI and the New York City Department of

Investigation ("DOI") have been conducting an investigation into allegations of fraudulent

billing practices in connection with the New York State Early Intervention Program (the

"EIP"), a program that provides remedial services to developmentally delayed children from

birth to age three. Such services may include physical, occupational, and speech therapy;

special instruction; and social work services. These services are provided by individual

therapists who are either subcontractors or employees of agencies that hold EIP contracts with

the New York State Department of Health ("NYS DOH"). NYC DOHMH administers the

EIP in New York City and conducts audit, quality assurance, and compliance oversight of the

EIP, under the ultimate oversight of NYS DOH.

7.     In order to receive payment for an EIP therapy session, a therapist must provide

a written report, known as a session note, documenting his or her session with a child.

Sessions generally occur in half-hour or one-hour increments. These session notes detail the

date, time and place of the session as well as some details of the therapy given and the child's

progress in response to the treatment. Session notes must be signed by the therapist and the

parent or guardian of the child immediately after the EIP therapy session ends.

8.     As set forth in the Complaint, the investigation revealed that in or about and

between August 1, 2012 and April 30, 2018, the defendants, all EIP therapists, submitted

numerous fraudulent session notes and accompanying invoices for non-existent EIP sessions

purportedly occurring in the Eastern District of New York and elsewhere.

9.      On October 4, 2018, agents from the FBI and DOI arrested all eight defendants identified in the complaint, and seized the SUBJECT DEVICES incident to those arrests. Specifically, agents seized the following devices from the following individuals:

    a. DEVICE #1 was seized from DOYLE's bedroom after law enforcement agents observed DOYLE'S photograph on the phone's background, and observed that DOYLE knew the passcode to access the phone;

    b. DEVICE #2 was seized from STEINBERG's hand after law enforcement agents observed STEINBERG using the phone, and after STEINBERG asked law enforcement agents if she could bring the phone with her;

    c. DEVICE #3 was seized from GOLFO's bedroom after law enforcement agents observed the phone on her nightstand;

    d. DEVICE #4 was seized from ONAGA's bedroom after ONAGA verbally confirmed that the phone belonged to her;

    e. DEVICE #5 was seized from BEYLINA's hand after law enforcement agents observed the phone in BEYLINA's hand, and after BEYLINA asked law enforcement agents if she could bring the phone with her;

    f. DEVICE #6 was seized from SCOPINICH's hand after law enforcement agents observed the phone in SCOPINICH's hand;

    g. DEVICE #7 was seized from HAKIM's kitchen after HAKIM's partner verbally confirmed that the phone belonged to HAKIM; and

    h. DEVICE #8 was seized from MENSAH's bedroom after law enforcement agents observed the phone on MENSAH's nightstand.

10.     The SUBJECT DEVICES are currently within the possession of the FBI within the Eastern District of New York.   Based upon my training and experience, I know that the SUBJECT DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICES first came into the possession of the FBI.

11.     As described in the Complaint, there is probable cause to believe there is information stored on the SUBJECT DEVICES concerning the SUBJECT OFFENSES.

12.     For example, as described in the Complaint, law enforcement officers identified the defendants' cellular telephone numbers based on EIP employment records, and compared historical location data or toll records for those telephones to location information contained in the EIP session notes submitted by the defendants.   On hundreds of occasions, DOYLE, STEINBERG, GOLFO, BEYLINA, SCOPINICH, HAKIM and MENSAH submitted session notes and accompanying invoices for EIP sessions that purportedly occurred at times when the defendants were not present in the vicinity of the EIP therapy session location.   In my training and experience, there is reason to believe that the SUBJECT DEVICES will contain evidence of the defendants' locations during these sessions.

13.     Agents also reviewed travel records for DOYLE, GOLFO, ONAGA, BEYLINA and HAKIM, and observed that, on dozens of occasions for each defendant, the defendants submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when they were outside of New York state, outside of the United States, or in transit.   In my training and experience, there is reasons to believe that the SUBJECT DEVICES will contain records of the defendants' travel during these sessions, including travel documents, itineraries receipts and photographs.

14.     Agents also reviewed toll records for the telephones numbers associate with the defendants , and observed that on hundreds of occasions per defendant, DOYLE, STEINBERG, GOLFO, BEYLINA, SCOPINICH, HAKIM and MENSAH were using their cellular telephone during a significant portion of the time period that they claimed to be performing EIP therapy sessions. According to NYC DOHMH officials, EIP therapists cannot treat a child while using a telephone, because EIP therapists must monitor, interact with, and take notes about the child throughout the entire session.   In my training and experience, there is reason to believe that the SUBJECT DEVICES will contain evidence of the defendants' activities on their telephones during these occasions.

15.     Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom the defendants claimed to provide EIP therapy sessions.   These caretakers informed law enforcement that they were frequently in contact with the defendants via cellular telephone, either by phone calls or by text messages.   In my training and experience, there is reason to believe that the SUBJECT DEVICES will contain evidence of communication between the defendants and the caretakers of children to whom the defendants claimed to provide EIP therapy sessions.

TECHNICAL TERMS

16.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  Wireless telephone (or mobile or cellular telephone):   A handheld wireless
>     device used for voice and data communication through radio signals.   These
>     telephones send signals through networks of transmitter/receivers, enabling
>     communication with other wireless telephones or traditional "land line"

telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and email; taking, sending, receiving and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device, and a wide variety of applications, also known as "apps," which may store the user's preferences and other data.   Such apps may include Facebook, Twitter and other social media services.

b.   <u>Digital camera</u>:   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   Most digital cameras also include a screen for viewing the stored images.   This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS:  A GPS navigation device uses the Global Positioning System to display
its current location.   It often contains records of the locations where it has
been.   Some GPS navigation devices can give a user driving or walking
directions to another location.   These devices can contain records of the
addresses or locations involved in such navigation.   The Global Positioning
System consists of 24 NAVSTAR satellites orbiting the Earth.   Each satellite
contains an extremely accurate clock.   Each satellite repeatedly transmits by
radio a mathematical representation of the current time, combined with a
special sequence of numbers.   These signals are sent by radio, using
specifications that are publicly available.   A GPS antenna on Earth can receive
those signals.   When a GPS antenna receives signals from at least four
satellites, a computer connected to that antenna can mathematically calculate
the antenna's latitude, longitude, and sometimes altitude with a high level of
precision.

d.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device
used for storing data (such as names, addresses, appointments or notes) and
utilizing computer programs.   Some PDAs also function as wireless
communication devices and are used to access the Internet and send and receive
e-mail.  PDAs usually include a memory card or other removable storage
media for storing data and a keyboard and/or touch screen for entering data.
Removable storage media include various types of flash memory cards or
miniature hard drives.   This removable storage media can store any digital
data.   Most PDAs run computer software, giving them many of the same

capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer or other electronic device, such as the SUBJECT DEVICES, that connects to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, longterm—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

17. Based on my training and experience, I know that the SUBJECT DEVICES have capabilities that allow them to serve as a wireless telephone; serve as a digital camera; serve as a PDA; track GPS data; take, store and share photographs and videos; and use a variety of apps. In my training and experience, examining data stored on devices of this type

can uncover, among other things, evidence that reveals or suggests who possessed or used the SUBJECT DEVICES.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the SUBJECT DEVICES.   This information can sometimes be recovered with forensics tools.

19.    As further described in Attachment B, this application seeks permission to locate not only data that might serve as direct evidence of the SUBJECT OFFENSES, but also for forensic electronic evidence that establishes how the SUBJECT DEVICES was used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence can be recovered from the SUBJECT DEVICES because:

  a.   Data on an electronic device can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b.   Forensic evidence on an electronic device can also indicate who has used or controlled the device.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c.   A person with appropriate familiarity with how an electronic device works can, after examining this forensic evidence in its proper context, draw conclusions about how devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic device that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, such evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding user attribution evidence, sometimes it is necessary to establish that a particular thing is not present on an electronic device.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

20.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT DEVICES consistent with the warrant.   The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the SUBJECT DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

21.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve intrusion into a physical location.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22. Based on all of the foregoing facts, there is probable cause to believe that a search of the SUBJECT DEVICES will lead to the discovery of the items described in Attachment B, which items constitute instrumentalities, fruits and evidence of violations Title 18, United States Code, Sections 666(a)(1)(A) and 1347.


MAEGAN REES
Special Agent
Federal Bureau of Investigation

Sworn to before me this
19th day of October, 2018

s/ Cheryl Pollak

THE HONORABLE
UNITED STATES 
EASTERN DISTRIC

14

**ATTACHMENT A**

The property to be searched is (i) ONE APPLE IPHONE, MODEL NUMBER MQAN2LL/A, IMEI NUMBER 359407088847136 ("DEVICE #1"); (ii) ONE SAMSUNG GALAXY S7 CELLULAR PHONE, IMEI NUMBER 357754070342622 ("DEVICE #2"); (iii) ONE APPLE IPHONE, SERIAL NUMBER F4GV8GUNJC6F ("DEVICE #3"); (iv) ONE SAMSUNG GALAZY S8 CELLULAR PHONE, MODEL NUMBER A1784, IMEI NUMBER 358332084023576 ("DEVICE #4"); (v) ONE APPLE IPHONE 8, WHITE IN COLOR, SERIAL NUMBER 353010096491305 ("DEVICE #5"); (vi) ONE APPLE IPHONE, SILVER AND WHITE IN COLOR, MODEL NUMBER MQ7R2LL/A, SERIAL NUMBER F4GVR5KKJC6L ("DEVICE #6"); (vii) ONE APPLE IPHONE, ROSE GOLD IN COLOR, SERIAL NUMBER FD3VL9GGJCM1 ("DEVICE #7"); and (viii) ONE APPLE IPHONE 7 PLUS, MODEL NUMBER A1784, FCC ID NUMBER BCGE3092A, IC NUMBER 579C-E3092A ("DEVICE #8") (collectively, the " SUBJECT DEVICES"), currently in HSI custody in the Eastern District of New York. This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the SUBJECT DEVICES described in Attachment A that relate to commission, or fruits or instrumentalities of violations of Title 18, United States Code, Sections 666(a)(1)(A) and 1347 and involve KADERRAH DOYLE, CARA STEINBERG, MARINA GOLFO, EGO ONAGA, LYUBOV BEYLINA, DANIELLE SCOPINICH, PATRICIA HAKIM and ENOCH MENSAH from the period August 1, 2012 through April 30, 2018, including:

a. names and telephone numbers, as well as the contents of all call logs, contact lists, text messages (including iMessages and messages contained in messaging applications), emails (including those sent, received, deleted and drafted), instant messages, photographs, videos, social media posts and/or messages, Internet activity (including browser history, web page logs, and search terms entered by the user), geo-location data, application data, and other electronic media;

b. evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as, for example, logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c. evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    d.  evidence of the times the Devices was used;

    e.  passwords, encryption keys, and other access devices that may be necessary to access the Devices; and

    f.  contextual information necessary to understand the evidence described in this Attachment.

       All of which constitute fruits or instrumentalities of violations of Title 18, United States Code, Sections 666(a)(1)(A) and 1347.

       As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# EXHIBIT A

NR:RCH/EMR
F. #2017R01784

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------X

UNITED STATES OF AMERICA

    - against -

KADERRAH DOYLE,
CARA STEINBERG,
MARINA GOLFO,
EGO ONAGA,
LYUBOV BEYLINA,
DANIELLE SCOPINICH,
PATRICIA HAKIM, and
ENOCK MENSAH,

               Defendants.

---------------------------X

**TO BE FILED UNDER SEAL**

AFFIDAVIT AND COMPLAINT IN
SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C. §§ 666(a)(1)(A) and 1347(a))

18-MJ-927

EASTERN DISTRICT OF NEW YORK, SS:

        MELISSA GALICIA, being duly sworn, deposes and states that she is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as

such.

        In or about and between August 1, 2012 and April 30, 2018, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KADERRAH DOYLE ("DOYLE"), CARA STEINBERG ("STEINBERG"),

MARINA GOLFO ("GOLFO"), EGO ONAGA ("ONAGA"), LYUBOV BEYLINA

("BEYLINA"), DANIELLE SCOPINICH ("SCOPINICH"), PATRICIA HAKIM

("HAKIM") and ENOCK MENSAH ("MENSAH"), (collectively, "the defendants"): (i) being

agents of an agency of a local government, to wit: the New York City Department of Health

and Mental Hygiene (the "NYC DOHMH"), did knowingly and intentionally embezzle, steal,

obtain by fraud, or otherwise without authority knowingly convert to the use of a person other

than the rightful owner, property that is valued at $5,000 or more and is owned by, or is under

the care, custody, or control of the NYC DOHMH, an organization that received benefits in

excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies,

loans, guarantees, insurance and other forms of Federal assistance in one or more one-year

periods; and (ii) did knowingly and willfully execute and attempt to execute a scheme and

artifice to defraud a health care benefit program, to wit: Medicaid, and to obtain, by means of

materially false and fraudulent pretenses, representations and promises, money and property

owned by and under the custody and control of said health care benefit program in connection

with the delivery of and payment for health care benefits and services.

(Title 18, United States Code, Section 666(a)(1)(A) and 1347(a))

The source of your deponent's information and the grounds for her belief are as

follows:[1]

1.     I have been a Special Agent with the Federal Bureau of Investigation

("FBI") for over three years. During my tenure with the FBI, I have participated in

investigations involving, among other things, fraud and financial crimes. I have also conducted

interviews, made arrests, executed search warrants, and secured other relevant information

using a variety of investigative techniques.   I am familiar with the facts and circumstances set

---

[1]     Because the purpose of this Complaint is to set forth only those facts necessary
to establish probable cause to arrest, I have not described all the relevant facts and
circumstances of which I am aware.

forth below from my participation in the investigation; my review of the investigative file; my communication with witnesses and other law enforcement officers; my review of reports of other law enforcement officers involved in the investigation; and my review of other records associated with the investigation.

2.    The FBI and the New York City Department of Investigation ("DOI") have been conducting an investigation into allegations of fraudulent billing practices in connection with the New York State Early Intervention Program (the "EIP"). The EIP is a New York State program that provides remedial services to developmentally delayed children from birth to age three. Such services may include physical, occupational, and speech therapy; special instruction; and social work services. These services are provided by individual therapists who are either subcontractors or employees of agencies that hold EIP contracts with the New York State Department of Health ("NYS DOH"). NYC DOHMH administers the EIP in New York City and conducts audit, quality assurance, and compliance oversight of the EIP, under the ultimate oversight of NYS DOH.

3.    In order to receive payment for an EIP therapy session, a therapist must provide a written report, known as a session note, documenting his or her session with a child. Sessions generally occur in half-hour or one-hour increments. These session notes detail the date, time and place of the session as well as some details of the therapy given and the child's progress in response to the treatment. Session notes must be signed by the therapist and the parent or guardian of the child immediately after the EIP therapy session ends.

4.    EIP therapists based in New York City are paid for their services through EIP agencies which are, in turn, reimbursed by either: (i) Medicaid; (ii) the NYC DOHMH (through an escrow account managed by New York State); or (iii) private insurance companies.

4

Between 2012 and 2018, NYC DOHMH received at least $10,000 in federal funds each calendar year.[2]

5.     As set forth below, the investigation to date has revealed that the defendants, all EIP therapists, submitted numerous fraudulent session notes and accompanying invoices for non-existent EIP sessions that purportedly occurred in the Eastern District of New York and elsewhere.

I.     KADERRAH DOYLE

6.     Between approximately November 2014 and May 2017, KADERRAH DOYLE, an EIP therapist, submitted fraudulent session notes and invoices.   In return, DOYLE received payment for at least 1,000 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere, resulting in the improper disbursement of more than $29,000 in Medicaid funds and more than $71,000 in NYC DOHMH funds.   For example:

a.     Law enforcement agents obtained historical location data[3] for DOYLE's cellular telephone, which was identified as DOYLE's cellular telephone based on, among other things, EIP employment records.   Law enforcement officers compared the historical location

_____

[2] The vast majority of reimbursements for EIP therapists do not come from private insurance companies, but instead come from either Medicaid or the NYC DOHMH. For example, in 2017, less than two percent of the total reimbursements for EIP therapists came from private insurance companies.

[3] In each instance herein where reference is made to historical location data that law enforcement agents obtained for cellular telephones, the data was obtained via a judicially authorized search warrant.

data[4] associated with DOYLE's telephone to location information contained in the EIP session notes submitted by DOYLE. Based on this review, agents determined that on more than 500 occasions, DOYLE was not present in the vicinity of the EIP therapy session location at the time that the session purportedly occurred.

        b.    Law enforcement officers also reviewed telephone toll records for DOYLE's cellular telephone and determined that on at least 350 occasions DOYLE was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session. According to NYC DOHMH officials, EIP therapists cannot treat a child while using a telephone, because EIP therapists must monitor, interact with, and take notes about the child throughout the entire session.

        c.    Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom DOYLE claimed to provide EIP therapy sessions. Based on these interviews, law enforcement officers identified at least 150 occasions in which DOYLE claimed to perform an EIP therapy session, but which the parent, guardian, teacher or daycare provider stated never actually occurred. This included numerous occasions when the parent, guardian, teacher or daycare provider stated that their signature on the fraudulent session note submitted by DOYLE was a forgery.

---

[4] Specifically, law enforcement agents obtained historical cell-site data for DOYLE's cellular telephone. Based on my training and experience, I know that historical cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from a given cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected at a given point in time. Historical cell-site data thus can establish the general geographic location of a cellular telephone at a given point in time.

6

d.      Additionally, at all times relevant to the investigation, DOYLE was employed as a full-time teacher with the New York City Department of Education ("DOE"). Law enforcement officers reviewed DOE attendance records and determined that, on at least 60 occasions, DOYLE submitted a fraudulent EIP invoice for a session that purportedly occurred during a time period when, according to DOE attendance records, DOYLE was at work.

e.      Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 55 occasions, DOYLE submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when DOYLE was either outside of New York State or in transit.

f.      Finally, law enforcement officers also identified numerous occasions in which DOYLE submitted two fraudulent EIP invoices in which DOYLE claimed to be providing EIP therapy sessions for two different children at two different locations at the same time.

II.     CARA STEINBERG

7.      Between approximately July 2015 and June 2017, CARA STEINBERG, an EIP therapist, submitted fraudulent session notes and invoices and received payment for more than 1,000 non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. These false claims resulted in the improper disbursement of more than $24,000 in Medicaid funds and more than $85,000 in NYC DOHMH funds. For example:

a.      Law enforcement officers reviewed telephone toll records for STEINBERG's cellular telephone, which they identified as STEINBERG's cellular telephone

based on, among other things, EIP employment records, and determined that on at least 260 occasions STEINBERG was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

b.     Law enforcement officers also reviewed telephone toll records for STEINBERG's cellular telephone and found that, on many occasions, those records identified the geographic region where STEINBERG was located at the time of a telephone contact.   On at least 250 occasions STEINBERG submitted a fraudulent EIP invoice for a purported EIP therapy session when the telephone toll records reflected that STEINBERG was not in the geographic region of the EIP therapy session at the time she claimed the EIP therapy session took place.

c.     Additionally, on numerous occasions STEINBERG claimed in her EIP session notes and invoices to have performed EIP therapy sessions at daycare providers.   Law enforcement officers reviewed attendance records at these daycare providers and identified at least 200 occasions in which STEINBERG claimed to perform an EIP therapy session at a daycare provider at a time when the attendance records reflected that the child purportedly receiving the EIP therapy was not present at the daycare or the daycare was closed at the time the session was claimed to occur.

d.     Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom STEINBERG claimed to provide EIP therapy sessions.   On at least 220 occasions, STEINBERG claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that the parent, guardian, teacher or daycare provider stated did not occur.   In addition, law enforcement officers also

8

reviewed text message correspondence between STEINBERG and certain parents, guardians, teachers and daycare providers and identified at least 80 occasions in which STEINBERG submitted an invoice for an EIP therapy session that never occurred, as reflected in the text message correspondence.

        e.     Law enforcement officers also identified instances in which STEINBERG submitted invoices for therapy sessions performed under a separate program, the DOE's Committee on Preschool Special Education ("CPSE") program.[5] Law enforcement officers reviewed STEINBERG's invoices for the CPSE program and determined that on at least 100 occasions STEINBERG submitted an invoice for an EIP therapy session purportedly occurring at one location for one child and an invoice for a CPSE therapy session purportedly occurring at the same time as the EIP therapy session, but at a different location for a different child.

        f.     Finally, law enforcement officers reviewed historical location data for STEINBERG's cellular telephone. Law enforcement officers compared the historical location data to location information contained in the EIP session notes submitted by STEINBERG and determined that STEINBERG, on numerous occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

III.    MARINA GOLFO

        8.     During the course of this investigation, law enforcement officers determined that MARINA GOLFO, an EIP therapist, had submitted numerous fraudulent

---

[5] Like the EIP, the CPSE program provides interventionist therapy sessions to children that may include speech therapy, physical therapy and special instruction. Although the EIP provides services for children from birth to three years old, the CPSE program provides services for children from three years old to five years old.

session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. Specifically, law enforcement officers determined that, between approximately April 2015 and February 2018, GOLFO submitted fraudulent session notes and invoices and received payment for more than 1,500 non-existent EIP sessions, resulting in the improper disbursement of more than $10,000 in Medicaid funds and more than $146,000 in NYC DOHMH funds. For example:

a.      Law enforcement officers reviewed telephone toll records for GOLFO's cellular telephone, which they identified as GOLFO's cellular telephone based on, among other things, EIP employment records, and determined that on at least 800 occasions GOLFO was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

b.      Law enforcement officers obtained historical location data for GOLFO's cellular telephone. Law enforcement officers compared the historical location data to location information contained in the EIP session notes submitted by GOLFO and determined that GOLFO, on more than 500 occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

c.      Law enforcement officers also reviewed toll records for GOLFO's cellular telephone and found that, on many occasions, those records identified the geographic region where GOLFO was located at the time of a telephone contact. On at least 175 occasions, GOLFO submitted a fraudulent EIP invoice for a purported EIP therapy session when the toll records reflected that GOLFO was not in the geographic region of the EIP therapy session at the time she claimed the session took place.

d.     Law enforcement officers also obtained license plate recognition ("LPR") records for a vehicle registered to GOLFO. Law enforcement officers compared LPR records to the EIP invoices submitted by GOLFO and determined that on at least 50 occasions GOLFO submitted an invoice for an EIP therapy session when LPR records reflected that her vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

e.     Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom GOLFO claimed to provide EIP therapy sessions. Law enforcement officers identified at least 60 occasions in which GOLFO claimed to perform an EIP therapy session, but which the parent, guardian, teacher or daycare provider stated did not occur as billed, including numerous occasions when the parent, guardian, teacher or daycare provider stated that their signature on the session note submitted by GOLFO for the EIP therapy session was, in fact, a forgery.

IV.     EGO ONAGA

9.     During the course of this investigation, law enforcement officers determined that EGO ONAGA, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. Between approximately April 2014 and April 2018, ONAGA submitted fraudulent session notes and invoices and received payment for more than 600 non-existent EIP sessions, resulting in the improper disbursement of more than $19,000 in Medicaid funds and more than $40,000 in NYC DOHMH funds. For example:

a.     Law enforcement obtained judicial authorization to place a GPS tracking device on a vehicle registered to ONAGA. Pursuant to a judicially authorized warrant, law

enforcement officers installed the device on or about March 13, 2018 and ceased using the device on or about April 27, 2018. Law enforcement officers determined that on approximately 330 occasions during that time period ONAGA submitted a fraudulent session note and invoice for an EIP therapy session when the GPS tracking device reflected that ONAGA was not the vicinity of the EIP therapy session location at the time she claimed the session occurred.

b. Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 170 occasions, ONAGA submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when ONAGA was, in fact, either outside of New York or in transit.

c. Additionally, during the course of the time period relevant to this investigation, ONAGA was employed full-time as a DOE teacher. Law enforcement officers reviewed DOE attendance records and overtime records and determined that, on at least 90 occasions, ONAGA submitted a fraudulent EIP invoice for a session that purportedly occurred during a time period when, according to DOE attendance records, ONAGA was at work.

V.   LYUBOV BEYLINA

10. During the course of this investigation, law enforcement officers determined that LYUBOV BEYLINA, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. Specifically, law enforcement officers determined that, between approximately August 2012 and January 2017, BEYLINA submitted fraudulent session notes and invoices and received payment for more than 600 non-existent EIP sessions,

12

resulting in the improper disbursement of more than $24,000 in Medicaid funds and more than $17,000 in NYC DOHMH funds.   For example:

      a.    Law enforcement officers reviewed toll records for BEYLINA's cellular telephone, which they identified as BEYLINA's cellular telephone based on, among other things, EIP employment records, and determined that on at least 300 occasions BEYLINA was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

      b.    Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom BEYLINA claimed to provide EIP therapy sessions.   Law enforcement officers identified at least 100 occasions in which BEYLINA claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.   In addition, law enforcement officers also reviewed text message correspondence between BEYLINA and certain parents, guardians, teachers and daycare providers and identified at least 180 occasions in which BEYLINA submitted an invoice for an EIP therapy session that, as reflected in the text message correspondence, never occurred.

      c.    Law enforcement officers also reviewed travel records for several airlines and determined that, on at least 80 occasions, BEYLINA submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when BEYLINA was, in fact, either outside of New York or in air transit.   For example, BEYLINA submitted 51 invoices for EIP therapy sessions purportedly occurring between June 28, 2016 and July 5, 2016, when BEYLINA was, in fact, in the Dominican Republic.   A photograph of BEYLINA in the

13

Dominican Republic during the time period she claimed she was in New York performing EIP therapy sessions is attached hereto as Exhibit A.

        d.      Finally, law enforcement officers reviewed historical location data for BEYLINA's cellular telephone. Law enforcement officers compared the historical location data to the EIP session notes submitted by BEYLINA and determined that BEYLINA, on numerous occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

## VI.   DANIELLE SCOPINICH

        11.    During the course of this investigation, law enforcement officers determined that DANIELLE SCOPINICH, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere. Between approximately January 2015 and July 2017, SCOPINICH submitted fraudulent session notes and invoices and received payment for more than 500 non-existent EIP sessions, resulting in the improper disbursement of more than $15,000 in Medicaid funds and more than $15,000 in NYC DOHMH funds. For example:

        a.     Law enforcement officers obtained historical location data SCOPINICH's cellular telephone, which they identified as SCOPINICH's cellular telephone based on, among other things, EIP employment records,. Law enforcement officers compared this historical location data to the EIP session notes submitted by SCOPINICH and determined that SCOPINICH, on more than 350 occasions, was not present in the vicinity of the EIP therapy session location at the time of the purported EIP therapy session.

b.      Law enforcement officers also learned, during the course of this investigation, that SCOPINICH was also submitting invoices for therapy sessions performed under the DOE's CPSE program.   Law enforcement officers reviewed SCOPINICH's invoices for the CPSE program and determined that on at least 48 occasions SCOPINICH submitted an invoice for an EIP therapy session purportedly occurring at one location for one child and an invoice for a CPSE therapy session purportedly occurring at the same time as the EIP therapy session, but at a different location for a different child.

c.      Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom SCOPINICH claimed to provide EIP therapy sessions.   Law enforcement officers identified at least 74 occasions in which SCOPINICH claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.

d.      Law enforcement officers also found that SCOPINICH repeatedly claimed in her EIP session notes and invoices to have performed EIP therapy sessions at daycare providers.   Law enforcement officers reviewed sign-in sheet records at these daycare providers and identified at least 50 occasions in which SCOPINICH claimed to perform an EIP therapy session at a daycare provider at a time when the sign-in sheet records reflected that SCOPINICH was not present at the daycare.

e.      Law enforcement officers reviewed toll records for SCOPINICH's cellular telephone and determined that on numerous occasions SCOPINICH was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

VII.   ENOCK MENSAH

12.   During the course of this investigation, law enforcement officers determined that ENOCK MENSAH, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Between approximately August 2013 and August 2017, MENSAH submitted fraudulent session notes and invoices and received payment for more than 1,200 non-existent EIP sessions, resulting in the improper disbursement of more than $105,000 in Medicaid funds and more than $20,000 in NYC DOHMH funds.   For example:

a.   Law enforcement officers obtained LPR records for a vehicle registered to MENSAH.   Law enforcement officers compared LPR records to the EIP invoices submitted by MENSAH.   On at least 1,000 occasions MENSAH submitted an invoice for an EIP therapy session when LPR records reflected that his vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

b.   Law enforcement officers reviewed toll records for MENSAH's cellular telephone, which they identified as MENSAH's cellular telephone based on, among other things, EIP employment records, and determined that on at least 200 occasions MENSAH was using his cellular telephone during at least a quarter of the time period that he claimed to be performing an EIP therapy session.

c.   Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom MENSAH claimed to provide EIP therapy sessions.   Law enforcement officers identified at least 90 occasions in which MENSAH claimed to perform an EIP therapy session and submitted an EIP session note containing a

signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.

VIII.   PATRICIA HAKIM

13.   During the course of this investigation, law enforcement officers determined that PATRICIA HAKIM, an EIP therapist, had submitted numerous fraudulent session notes and invoices for non-existent EIP sessions purportedly occurring in the Eastern District of New York and elsewhere.   Specifically, law enforcement officers determined that, between approximately March 2015 and October 2017, HAKIM submitted fraudulent session notes and invoices and received payment for more than 300 non-existent EIP sessions, resulting in the improper disbursement of more than $3,000 in Medicaid funds and more than $18,000 in NYC DOHMH funds.   For example:

a.   Law enforcement officers reviewed toll records for HAKIM's cellular telephone, which they identified as HAKIM's cellular telephone based on, among other things, EIP employment records, and determined that on at least 140 occasions HAKIM was using her cellular telephone during at least a quarter of the time period that she claimed to be performing an EIP therapy session.

b.   Law enforcement officers also reviewed telephone toll records for HAKIM's cellular telephone and found that, on many occasions, those records identified the geographic region where HAKIM was located at the time of a telephone contact.   On at least 60 occasions HAKIM submitted a fraudulent EIP invoice for a purported EIP therapy session when the telephone toll records reflected that HAKIM was not in the geographic region of the EIP therapy session at the time she claimed the EIP therapy session took place.

      c.    Law enforcement officers also obtained bank transaction records for accounts in HAKIM's name and identified at least 50 occasions in which HAKIM engaged in banking transactions out of New York State on the same dates that HAKIM claimed to be performing EIP therapy sessions in New York State.

      d.    Law enforcement officers also interviewed the parents, guardians, teachers and daycare providers of children to whom HAKIM claimed to provide EIP therapy sessions. Law enforcement officers identified at least 30 occasions in which HAKIM claimed to perform an EIP therapy session and submitted an EIP session note containing a signature that the parent, guardian, teacher or daycare provider stated was a forgery or for a session that did not occur.

      e.    Law enforcement officers also learned, during the course of this investigation, that HAKIM was also submitting invoices for therapy sessions performed under the DOE's CPSE program. Law enforcement officers reviewed HAKIM's invoices for the CPSE program and determined that on at least 30 occasions HAKIM submitted an invoice for an EIP therapy session purportedly occurring at one location for one child and an invoice for a CPSE therapy session purportedly occurring at the same time as the EIP therapy session but at a different location for a different child.

      f.    Law enforcement officers obtained LPR records for a vehicle registered to HAKIM. Law enforcement officers compared LPR records to the EIP invoices submitted by HAKIM and determined that on at least 10 occasions HAKIM submitted an invoice for an EIP therapy session when LPR records reflected that her vehicle was not in the vicinity of the EIP therapy session location at the time of the purported session.

g.     Law enforcement officers also reviewed travel records for several airlines and determined that, on numerous occasions, HAKIM submitted fraudulent EIP invoices for therapy sessions that purportedly occurred when HAKIM was, in fact, either outside of New York or in air transit, including when HAKIM was traveling abroad in Ireland and Spain.

IX.     REQUEST FOR SEALING

14.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application itself.   I believe that sealing these documents is necessary to preserve the integrity of this ongoing criminal investigation.   Based upon my training and experience, I have learned that criminals actively search online for criminal affidavits and arrest warrants via the Internet, and disseminate them to other criminals as they deem appropriate.   Premature disclosure of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

19

WHEREFORE, your deponent respectfully requests that the defendants KADERRAH DOYLE, CARA STEINBERG, MARINA GOLFO, EGO ONAGA, LYUBOV BELINA, DANIELLE SCOPINICH, ENOCK MENSAH and PATRICIA HAKIM be dealt with according to law.

MELISSA GALICIA
Special Agent, Federal Bureau of Investigation

Sworn to before me this
2 day of October, 2018

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# Exhibit A

